# THE DISTRICT OF COLUMBIA *v.* LYNHAM.

POLICE REGULATIONS; DRUG ADULTERATION.

It is no defense for a druggist who is prosecuted for selling an adulterated drug in violation of the act of Congress of February 17, 1898 (30 Stat. 246) relating to the adulteration of foods and drugs in this District, to show simply that he was at the time of sale, or of possession for sale, ignorant of the fact that the drug was adulterated. He must know what he sells, or proposes to sell, and that it conforms to the standard prescribed by law.

No. 943. Submitted January 3, 1900. Decided February 7, 1900.

IN ERROR, to the Police Court of the District of Columbia. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. A. B. Duvall,* Attorney for the District of Columbia, and *Mr. Clarence A. Brandenburg,* Assistant Attorney, for the plaintiff in error.

*Mr. A. A. Lipscomb* and *Mr. M. J. Colbert* for the defendant in error.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This case comes from the Police Court of this District on writ of error, and the question presented is, whether the act charged against the defendant in error, Waddie E. Lynham, was a violation of the act of Congress of February 17, 1898, entitled "An act relating to the adulteration of foods and drugs in the District of Columbia."

The defendant in the court below was charged by information, with selling a certain drug, to wit, "Hoffman's Anodyne," the same not being of the strength, quality and purity, as laid down and required by the United States Pharmacopœia, contrary to the act of Congress.

The defendant pleaded not guilty, and was tried by a jury, and was acquitted. The District of Columbia brings up the case on writ of error.

The pharmacopœia referred to in the act of Congress, and in the information against the defendant, as furnishing the standard for testing drugs, is a book of authoritative directions for the selection and preparation of substances to be used as medicines, including a list of the articles of the *materia medica,* with their character and tests. It is said that almost every civilized country of importance has its own pharmacopœia. The pharmacopœia of the United States is recognized by statute, and is drawn up by a national convention of delegates from medical societies and universities, and is revised, or intended to be revised, every ten years, and is considered an authoritative standard for determining the composition of drugs. The present current edition is that of 1890.

It appears by the bill of exceptions taken at the trial, that the defendant, a druggist doing business in this city, sold to one Lynch a small bottle of "Hoffman's Anodyne," which, upon analysis by the chemist for the Health Office of the District of Columbia, was found to contain no ethereal oil, a necessary ingredient thereof, according to the United States pharmacopœia. The defendant claimed, and he insisted upon the fact as a defense to the prosecution, that he had sold the anodyne to Lynch in the condition he received it from the manufacturer, without taking anything therefrom or adding anything thereto; "that he changed the drug when he received it into a bottle when he sold it to Lynch. That the ingredients in Hoffman's Anodyne were of such a character that the ethereal oil speedily disintegrated into sulphuric acid and alcohol, and that such disintegration frequently occurred before the Hoffman's Anodyne had reached the druggist from the manufacturer and without the bottle having been uncorked."

The prosecution showed in rebuttal, that Hoffman's

Anodyne would remain in perfect condition for two or three years; and then read in evidence from the United States Pharmacopœia, edition of 1890, and official, the composition of Hoffman's Anodyne, as follows:

*Spiritus Ætheris Compositus.*

Compound Spirit of Ether.   (Hoffman's Anodyne.)

Ether, three hundred and twenty-five cubic centimeters ..................................................... 325cc

Alcohol, six hundred and fifty cubic centimeters... 650cc

Ethereal oil, twenty-five cubic centimeters... ....... 25cc

To make one thousand cubic centimeters...... 1,000cc
      Mix them.

At the close of the evidence, the court, at the instance of the defendant, instructed the jury, that if they found that any of the ingredients of Hoffman's Anodyne was of such a nature that it would speedily disappear by evaporation or would disintegrate into alcohol and sulphuric acid; and that without knowledge on the part of the defendant, said ingredients or any of them had disappeared by evaporation or disintegration, then the jury should acquit the defendant.

In giving such instruction we think there was manifest error.   Indeed, it is plainly in contravention of the reason and spirit of the act of Congress, if not of the very letter of the statute.   It is true, the act is a stringent one in its provisions, but without such stringency it would be simply ineffectual as a means to accomplish the object proposed. To fully appreciate the real scope and intent of the act, it may be well to quote those parts of it that have relation to the subject matter of this prosecution.

Section 1 of the act provides, " that no person shall, within the District of Columbia, by himself or by his servant or agent, or as the servant or agent of any other person, sell, exchange or deliver, or have in his custody or possession with the intent to sell or exchange, any article of food or drug which is adulterated within the meaning of this

act." This provision, as will be observed, is positive in its terms.

Section 2 declares, " that the term 'drug' as used in this act, shall include all medicines for external or internal use, antiseptics, disenfectants and cosmetics."

And by section 3 it is provided, " that an article shall be deemed to be adulterated within the meaning of this act: (*a*) In the case of drugs: First, if, when sold under or by a name recognized in the United States pharmacopœia, it differs from the standard of strength, quality or purity laid down in the edition thereof at the time official; second, if, when sold under or by a name not recognized in the United States pharmacopœia, but which is found in the German, French or English pharmacopœia, it differs from the strength, quality or purity laid down therein ; third, if, when sold as a patented medicine, compounded drug or mixture, it is not composed of all the ingredients advertised or printed or written on the bottle, wrapper or labels of or on or with the patented medicine, compounded drug or mixture : *Provided,* that if the defendant in any prosecution under this act, *in respect to the sale of any such patented medicine, compounded drug or mixture,* shall prove to the satisfaction of the court that he had purchased the article in question as the same in nature, substance and purity as that demanded of him by the purchaser, and with a written warranty to that effect; that he had no reason to believe at the time when he sold it that the article was otherwise, and that he sold it in the same state as when he purchased it, he shall be discharged from the prosecution."

The Hoffman Anodyne, it appears, is recognized and described in the United States pharmacopœia, and is not of the third class and description of medicines and compounds referred to in the third section of the act of Congress; nor did the defendant attempt to make and establish the defense as provided in the proviso to the third section of the act may be done, " in respect to the sale of any such patented medicine, compounded drug or mixture."

In the trial of a prosecution under this statute, it is incumbent upon the District of Columbia, in whose name the prosecution is conducted, to prove the sale and delivery of the medicine or drug by the defendant, or his possession thereof for purpose of sale, and that the same was adulterated within the meaning of the statute. The prosecution upon such proof makes out a *prima facie* case of guilt against the defendant; and it is no defense for the defendant to show simply that he was at the time of sale, or of possession for sale, ignorant of the fact of such adulteration of the drug or medicine. He must know what he sells or proposes to sell, and that it conforms to the standard prescribed by law. As a registered druggist, he holds himself out to the public as being sufficiently skilled to know and understand of what constituents or ingredients the drugs and medicines that he offers for sale are composed, and especially in respect to all such drugs and medicines as are recognized and described in the pharmacopœia. It is not in his mouth to say, when it is shown that the drug was impure or adulterated at the time of sale, that he was ignorant of the fact. If such defense could be allowed there would be no protection to the public against impurities and adulterations of drugs and foods. We all know, as matter of common knowledge, that adulterations of drugs and food have been carried to a fearful extent, and so serious has the evil become that the health and life of the people are frequently endangered. To correct the evil as far as possible, legislation has been resorted to in most of the civilized nations, and particularly in England and in most of the States of our Union. Such legislation, to be effective, must of necessity be of a very stringent character. It is passed in the exercise of the police power, hence, the fact of knowledge on the part of the party offending against the provisions of the statute, is almost universally regarded as quite immaterial to the question of his liability. This is an established principle both in the English and American courts.

In the case of *Reg.* v. *Woodrow*, 15 M. & W. 405, a dealer in and retailer of tobacco, was held liable to the penalty prescribed by the statute, for having in his possession adulterated tobacco, although he had purchased it as genuine, and had no knowledge or cause to suspect that it was not so. The Stat. 5 and 6 Vict., Ch. 93, under which the prosecution occurred, simply provided, by its third section, "that every manufacturer of, dealer in, or retailer of tobacco, who *shall receive or take into or have in his possession, or who shall sell*, send out or deliver any tobacco or snuff which shall have been manufactured with, or shall have had added thereto or mixed therewith, or into or amongst which there shall have been put, either before or after being manufactured, or in which there shall be found on examination thereof, any other material, liquid, substance, matter, or thing, than, as respects tobacco, water only," shall forfeit £200. That case was very fully argued, and Chief Baron Pollock, in the course of his opinion, said: "It appears to me, that, in this case, it being within the personal knowledge of the party that he was in the possession of the tobacco, it is not necessary that he should know that the tobacco was adulterated; for reasons probably very sound, and not applicable to this case only, but to many other branches of the law, persons who deal in an article are made responsible for its being of a certain quality. If this were the case of provisions, or of any matter that affected the public health, it would not be at all unreasonable to require persons dealing in them to be aware of their character and quality, and to be responsible for their goodness, whether they know it or not;—they are bound to take care. It appears to me that the section referred to, which creates this offense, namely, the third section of the 5 and 6 Vict., Ch. 93, applies to this case, whether the party knew it or not." And of this opinion were all the other judges of that court.

The American cases which hold a similar doctrine to that just stated are numerous. They hold that a party forbidden

to sell, or to keep for sale, any article of food or drug, adulterated and not according to a defined standard of purity, can not relieve himself from liability by showing that he sold or offered to sell the article without knowledge of its impurity or adulteration. He must be taken to know of what the article is constituted that he offers for sale. And unless the statute *expressly declares* that the party shall be convicted *only* upon its being shown that the drug or medicine was sold, or possessed to be sold, by the defendant, *knowing it to be adulterated or impure,* the question of the knowledge of the defendant as to the adulteration or impurity of the article is wholly immaterial to the matter of guilt of the defendant. The purpose and policy of the statute is to prohibit unconditionally and unqualifiedly the sale of impure and adulterated drugs, and thus to protect the public against injury; and the safety to the public consists in the integrity, skill and knowledge of the druggist, in the exercise of his professional employment. It is to secure these objects in the business of druggists that statutes have been passed in most of the States, of the stringent character to which we have referred. And without referring specially to the provisions of those statutes, and to the facts of each particular case, that has been decided thereon, it will suffice to refer to some of the leading cases upon the subject, where the principle may be found discussed. *People* v. *Clipperley,* 101 N. Y. 634; *People* v. *Kibler,* 106 N. Y. 321; *Com.* v. *Farren,* 9 Allen, 489; *Com.* v. *Waite,* 11 Allen, 264; *Com.* v. *Smith,* 103 Mass. 444; *Com.* v. *Warren,* 160 Mass. 533; *Com.* v. *Gray,* 150 Mass. 327; *State* v. *Newton,* 50 N. J. L. 549; *Brown* v. *Marshall,* 47 Mich. 576; *People* v. *Robey,* 52 Mich. 577; *Smith* v. *Hays,* 23 Ill. App. 244; *Walton* v. *Booth,* 34 La. Ann. 913; *State* v. *Campbell,* 64 N. H. 402.

Without further comment, we conclude that the judgment of the court below must be reversed, and the cause be remanded for new trial; and it is so ordered.

*Judgment reversed, and cause remanded.*